Abel OBABUEKI, Plaintiff,

v.

INTERNATIONAL BUSINESS MA-
CHINES CORP. and Choice-
point, Inc., Defendants.

No. 99 CIV. 11262(AGS),
99 CIV. 12486(AGS).

United States District Court,
S.D. New York.

June 14, 2001.

Gregory Antollino, New York, NY, for Plaintiff.

Kevin G. Lauri, Jackson Lewis Schnitzler & Krupman, International Business Machines Corp., New York, NY, for Defendant.

James H. Cox, Paul, Hastings, Janofsky & Walker LLP, Atlanta, GA, for Defendant Choicepoint, Inc.

## *AMENDED OPINION AND ORDER*

SCHWARTZ, District Judge.

This diversity action arises out of the withdrawal of an employment offer to plaintiff Abel Obabueki ("plaintiff") by de-fendant International Business Machines Corp. ("IBM"). Plaintiff alleges that IBM improperly considered his dismissed misdemeanor conviction in making its decision to withdraw the offer, and failed to properly inform plaintiff of its intent to withdraw the offer, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 296(15), 296(16) ("Sections 296(15) and 296(16)"), and the Fair Credit Reporting Act ("FCRA" or "the Act"), 15 U.S.C. §§ 1681 *et seq.* Plaintiff asserts claims against defendant Choicepoint, Inc. ("Choicepoint") under the FCRA and Section 349 of the New York General Business Law as a result of Choicepoint's allegedly improper provision of information related to the conviction to IBM. Currently before the Court are cross-motions for summary judgment on plaintiff's claims against each defendant, and plaintiff's motions to strike certain of each defendant's affirmative defenses. For the reasons set forth below, the motions are granted in part and denied in part.

## I. Factual Background [1]

### A. The Parties and Plaintiff's 1995 Conviction

Plaintiff, a citizen of Connecticut, has a Ph. D. in Materials Science and Engineering and a Master of Business Administration ("MBA") from Stanford University. (IBM's Statement of Undisputed Material Facts ("IBM 56.1") ¶ 1; Plaintiff's Rule 56.1 Counter Statement on IBM Claims ("Pl. 56.1 Resp. IBM") ¶ 1.) IBM is a corporation organized and existing under the laws of Delaware with its principal place of business in Armonk, New York. (Amended Complaint ("Compl.") ¶ 3.) Choicepoint [2], a

1. The following facts are undisputed, unless otherwise noted.

2. For the purpose of the instant motions, Choicepoint refers to defendants Choicepoint, Inc. and Choicepoint Services, Inc. (*See* Plain-

corporation organized and existing under the laws of Georgia with its principal place of business in Atlanta, is a consumer reporting agency. (*Id.* ¶ 4; Plaintiff's Rule 56.1 Statement on Choicepoint Claims ("Pl. 56.1 Choicepoint") ¶ 27; Choicepoint's Rule 56.1 Counter Statement ("Choicepoint 56.1 Resp.") ¶ 27.) Choicepoint regularly engages in whole or in part in the practice of assembling or evaluating information on consumers for the purpose of furnishing consumer reports to employers for employment purposes. The information on consumers which Choicepoint compiles and reports to employers is drawn from matters of public record. (Pl. 56.1 Choicepoint ¶¶ 26, 28, 29; Choicepoint 56.1 Resp. ¶¶ 26, 28, 29.)

In 1995, plaintiff was arrested and charged with fraud in obtaining welfare aid.[3] He entered a plea of nolo contendere, was ordered to pay restitution for the

tiff's Rule 56.1 Counter Statement on Choicepoint Claims ("Pl. 56.1 Resp. Choicepoint") ¶ 17 n. 3.) In his motion papers, plaintiff indicates his intention to voluntarily dismiss Choicepoint Business and Government Services, Inc. as a defendant, and such dismissal is hereby so ordered. (*Id.*)

3. According to plaintiff, his wife had been receiving welfare benefits under the federal Aid to Families with Dependent Children program ("AFDC"). (Compl.¶ 10.) Plaintiff's conviction apparently arose out of his failure to properly report a change in income status to the government when he was a paid summer intern between his first and second year at Stanford Business School. (*Id.* ¶ 19.) Plaintiff also claims that, on a civil administrative appeal from the AFDC's determination that plaintiff was required to refund the benefits, an administrative law judge found the local AFDC office at fault for informing plaintiff that he was not required to report in writing that he was working. (*Id.* ¶ 15.)

4. Section 1203.4 provides in pertinent part:

(a) In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been dis-

amount he illegally obtained, was fined $100, served 13 days in jail, and was placed on two years' probation. (IBM 56.1 ¶ 3; Pl. 56.1 Resp. IBM ¶ 3; Declaration of Gregory Antollino dated July 4, 2000 in Support of Plaintiff's Motion for Summary Judgment Against Choicepoint ("Antollino Choicepoint Decl."), Ex. E.) On January 27, 1997, plaintiff's conviction was "vacated" and "dismissed" pursuant to California Penal Code § 1203.4 ("Section 1203.4").[4] The Order disposing of his case (the "California Order") stated that plaintiff was convicted of a misdemeanor offense, and was discharged from probation prior to the termination of the designated period. (Declaration of Gregory Antollino dated July 18, 2000 in Support of Plaintiff's Motion for Summary Judgment Against IBM ("Antollino IBM Decl."), Ex. 3.) The California Order further directed that "the

charged prior to the termination of the period of probation ... the defendant shall, at any time after the termination of the period of probation, if he or she is not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw his or her plea of guilty or plea of nolo contendere and enter a plea of not guilty ... and ... the court shall thereupon dismiss the accusations or information against the defendant and except as noted below, he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted .... However, in any subsequent prosecution of the defendant for any other offense, the prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed. The order shall state, and the probationer shall be informed, that the order does not relieve him or her of the obligation to disclose the conviction in response to any direct question contained in any questionnaire or application for public office, for licensure by any state or local agency, or for contracting with the California State Lottery. Section 1203.4(a).

plea, verdict, or finding of guilt ... be set aside and vacated and a plea of not guilty be entered; and that the complaint be, and hereby is, dismissed." (*Id.*) Finally, the California Order stated, in parallel language to Section 1203.4, that:

"[Plaintiff] is advised that this Order does not relieve him/her of the obligation to disclose the above referenced conviction in response to any direct question contained in any questionnaire or application for public office or for licensure by any State or local agency, or for contracting with the California State Lottery."

(*Id.;* IBM 56.1 ¶ 5; Pl. 56.1 Resp. IBM ¶ 5; *see also* Section 1203.4.) The record of the conviction was not sealed.[5] (IBM 56.1 ¶ 7; Pl. 56.1 Resp. IBM ¶ 7.)

Subsequently, plaintiff engaged the services of a private detective to determine what a prospective employer could learn about his conviction by performing a background check. (IBM 56.1 ¶ 8; Pl. 56.1 Resp. IBM ¶ 8; Pl. Dep., Ex. B to Lauri Aff., at 176–82, 461–67.) The detective advised plaintiff that his record was clear and contained no convictions. (IBM 56.1 ¶ 9; Pl. 56.1 Resp. IBM ¶ 9.) Plaintiff claims that he conducted a similar investigation on his own, and was unable to locate information containing his conviction. (Pl. Dep. at 176–82, 461–67.)

## B. Plaintiff's Application for Employment at IBM

At IBM, once a decision is made to make a conditional offer of employment to a candidate, the individual is asked to complete an application form. (IBM 56.1 ¶ 18; Pl. 56.1 Resp. IBM ¶ 18.) An applicant must also complete a Security Data Sheet ("SDS"), which requests, *inter alia,* that he identify whether he has pleaded guilty or "no contest" to a crime or other offense within the last seven years.[6] However, the applicant is expressly requested not to include "arrests without convictions" or "convictions or incarcerations for which a record has been sealed or expunged." (IBM 56.1 ¶ 19; Pl. 56.1 Resp. IBM ¶ 19; Ex. M to Lauri Aff.) Both the application form and SDS provide that "any misrepresentation or deliberate omission of a fact ... will justify terminating consideration" of the application for employment. (IBM 56.1 ¶ 20; Pl. 56.1 Resp. IBM ¶ 20.) Further, IBM policy states that the mere identification of a conviction on the SDS will

5. During the course of this litigation, IBM discovered that, in 1993, plaintiff had also been arrested for and pleaded guilty to charges of shoplifting, a misdemeanor. (Affidavit of Kevin G. Lauri dated June 21, 2000 ("Lauri Aff."), Ex. H.) Such conviction was similarly dismissed pursuant to Section 1203.4. (Ex. J. to Lauri Aff. at CS–169.) While potentially relevant to defendants' affirmative defenses and an analysis of Choicepoint's investigatory procedures, *see infra,* plaintiff's 1993 conviction was not a factor in IBM's decision to withdraw plaintiff's conditional employment offer. Therefore, notwithstanding IBM's frequent mention of such conviction in its motion papers, the Court declines to consider it in its analysis of plaintiff's claims against IBM. (*See* Choicepoint's Memorandum Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of its Cross–Motion for Summary Judgment ("Choicepoint Mem.") at 7 (noting that only plaintiff's 1995 conviction is at issue in this motion)); Plaintiff's Reply Memorandum of Law in Further Support of His Motion for Partial Summary Judgment Against Choicepoint and in Opposition to Choicepoint's Motion ("Pl.Rep.Choicepoint") at 11 n. 6 (noting that the law is the same with respect to both convictions).

6. Under the FCRA, credit agencies may not report convictions that are more than seven years old. 15 U.S.C. § 1681c(a)(5) (prohibiting the reporting of records of arrest or conviction that antedate the report by more than seven years); *see Wiggins v. Equifax Servs. Inc.,* 848 F.Supp. 213, 220 (D.C.D.C.1993).

not subject an applicant to disqualification. (IBM 56.1 ¶ 21; Pl. 56.1 Resp. IBM ¶ 21.) Rather, the policy requires that the company perform an analysis of whether the crime is related to the position for which the applicant has applied. (IBM 56.1 ¶ 22; Pl. 56.1 Resp. IBM ¶ 22.) Specifically, the policy provides that "when reviewing information listed on the SDS (i.e. criminal record history) of a potential employee," the Human Resources unit responsible for hiring must perform an analysis of the crime in relation to the job being offered to determine whether placing the applicant in the position would create a risk to the safety or property of others. (IBM 56.1 ¶ 23; Pl. 56.1 Resp. IBM ¶ 23.)

In April 1999, Olwyn Spencer ("Spencer"), IBM's Program Director for Market Management, identified the need for a marketing manager position for the company's JAVA Company Software group. Spencer, who is also the Hiring Manager for that group, initially posted the position notice on the IBM website for IBM employees. (IBM 56.1 ¶ 24; Pl. 56.1 Resp. IBM ¶ 24.) By August 1999, no internal candidates had emerged. James Bailey ("Bailey"), an IBM recruiter, then sought outside candidates for the position.[7] At a certain point, Bailey received plaintiff's resume from another IBM recruiter, and sent it to Kathy Brown ("Brown"), the IBM Account Manager for the JAVA position, who in turn forwarded it to Spencer for consideration. (IBM 56.1 ¶¶ 25–26; Pl. 56.1 Resp. IBM ¶¶ 25–26.)

In September 1999, plaintiff interviewed with Spencer for the marketing manager position. Spencer rated plaintiff an outstanding candidate for the job, and he was given a conditional offer of employment subject to a background check.[8] Plaintiff then completed the IBM application form and SDS. (IBM 56.1 ¶¶ 27–29; Pl. 56.1 Resp. IBM ¶¶ 27–29; Pl. 56.1 IBM ¶¶ 14–15; IBM 56.1 Resp. ¶¶ 14–15; Ex. A. to Compl.) In response to the question regarding prior convictions that were neither "expunged" nor "sealed," plaintiff checked "no." (IBM 56.1 ¶ 30; Pl. 56.1 Resp. IBM ¶ 30.)

IBM retained Choicepoint to perform the background check on plaintiff, pursuant to a longstanding agreement (the "IBM–Choicepoint Agreement") whereby Choicepoint renders "background Verification Services" to IBM.[9] (Pl. 56.1 IBM ¶¶ 21–22; IBM 56.1 Resp. ¶¶ 21–22; Agreement for IBM and Equifax Services, Inc., Ex. O to Antollino Choicepoint Decl.)[10] On September 28, 1999, an individual working for Inquest, one of Choicepoint's contractors, was sent to the state courthouse in Santa Clara County, California to check for criminal convictions of plaintiff. (Choicepoint's Statement Pursuant to Local Civil Rule 56.1 ("Choicepoint 56.1") ¶ 12; Pl. 56.1 Resp. Choicepoint ¶ 12.) The contractor identified plaintiff's former conviction for welfare fraud and reported it to Choicepoint. (Choicepoint 56.1 ¶ 13; Pl. 56.1 Resp. Choicepoint ¶ 13;

---

7. If an appropriately qualified IBM employee is available for an IBM position, that person will be chosen over an outside candidate. (Plaintiff's Rule 56.1 Statement on IBM Claims ("Pl. 56.1 IBM") ¶ 88; IBM's Rule 56.1 Counter–Statement ("IBM 56.1 Resp.") ¶ 88.)

8. According to Eric Ketzel, IBM's Human Resources advisor to Spencer's group, the background check includes a credit check, crimi-

nal check, and a drug test. (Ketzel Dep., Ex. G to Lauri Aff., at 48–49.)

9. Choicepoint's performance under this agreement in plaintiff's case is discussed in Part II.D, *infra*.

10. Equifax is the predecessor-in-interest of Choicepoint. (IBM–Choicepoint Agreement at CS–249.)

Pl. 56.1 Choicepoint ¶ 38; Choicepoint 56.1 Resp. ¶ 38.)

On or about October 5, 1999, IBM received a report from Choicepoint, apparently based on the information Choicepoint had obtained from Inquest, which reflected plaintiff's welfare fraud conviction (the "First Report").[11] However, the report failed to mention the dismissal of the conviction pursuant to Section 1203.4. (IBM 56.1 ¶ 31; Pl. 56.1 Resp. IBM ¶ 31; Pl. 56.1 Choicepoint ¶¶ 39–40; Choicepoint 56.1 Resp. ¶¶ 39–40; Ex. B. to Compl.) Upon receiving the First Report, Brown contacted plaintiff and advised him of its contents.[12] Plaintiff responded that the conviction had been vacated and the case dismissed, and provided Brown with a copy of the California Order. (IBM 56.1 ¶¶ 33–34; Pl. 56.1 Resp. IBM ¶¶ 33–34; Pl. Dep. at 236–37, 279–80.) However, plaintiff did not explicitly state that the conviction had been "expunged" or "sealed." (IBM 56.1 ¶ 35; Pl. 56.1 Resp. IBM ¶ 35; Pl. Dep. at 236–37, 279–80; Brown Dep., Ex. E to Lauri Aff., at 63–64.)

Several IBM employees then reviewed plaintiff's candidacy in light of the First Report and the California Order. Each of them concluded that plaintiff should have disclosed his conviction on the SDS. (IBM 56.1 ¶¶ 36–45; Pl. 56.1 Resp. IBM ¶¶ 36–45.) These individuals were (i) Brown, (ii) Dick Carson ("Carson"), the Policies and Practices Manager, and (iii) Ketzel. (*Id.*)

On October 11, 1999, Ketzel met with Spencer and advised her that plaintiff had lied on his application because he failed to reveal the conviction. (IBM 56.1 ¶ 44; Pl. 56.1 Resp. IBM ¶ 44.) On the basis of Ketzel's representations, Spencer determined that the trust necessary to initiate an employment relationship did not exist, and decided to withdraw plaintiff's conditional offer as a result of his alleged misrepresentation on the SDS. (IBM 56.1 ¶ 45; Pl. 56.1 Resp. IBM ¶ 45.) Joseph Damassa, an IBM vice president, approved Spencer's decision. (Pl. 56.1 IBM ¶¶ 65–66; IBM 56.1 Resp. ¶¶ 65–66; Spencer Dep., Ex 4 to Antollino IBM Decl., at 94–97.) The underlying facts concerning plaintiff's former conviction were not discussed or factored into the decision; IBM contends that the job offer was withdrawn because plaintiff lied on his employment application. (Pl. 56.1 IBM ¶ 63; IBM 56.1 Resp. ¶ 63.)

On or about October 13, 1999, Brown called plaintiff and told him that IBM intended to withdraw its conditional offer of employment.[13] (IBM 56.1 ¶ 46; Pl. 56.1 Resp. IBM ¶ 46; Pl. Dep. at 279–81.) By letter dated October 13, 1999, IBM informed plaintiff that it "intend[ed] not to employ [him] based in part on information contained in [the First Report]." Attached to the letter was a copy of the First Report and a written description of plaintiff's rights under the FCRA.[14] (Letter

---

11. Choicepoint claims that before sending the report, it confirmed that the conviction information obtained was indeed that of plaintiff. Choicepoint also states that it did not communicate this information to any other entity. (Choicepoint 56.1 ¶¶ 14–16.) Neither Choicepoint's contractor nor Choicepoint reported plaintiff's 1993 shoplifting conviction. (IBM 56.1 ¶ 32; Pl. 56.1 Resp. IBM ¶ 32.)

12. Choicepoint did not contact plaintiff regarding the information it was reporting to IBM. (Pl. 56.1 Choicepoint ¶ 43; Choicepoint 56.1 Resp. ¶ 43.)

13. The parties disagree as to whether Brown told plaintiff that IBM "was withdrawing" the offer or that IBM merely "intended" to do so. (IBM 56.1 ¶ 46; Pl. 56.1 Resp. IBM ¶ 46; Pl. Dep. at 278; Brown Dep. at 69–70.) Given the clear terms of the letter sent on the same day, this factual dispute is immaterial.

14. IBM distributes to its Human Resources personnel information concerning the FCRA and its requirements and the proper forms or other material to be issued to comply with the FCRA. (IBM 56.1 ¶ 53; Pl. 56.1 Resp. IBM ¶ 53.)

from IBM HR–USA Staffing to Plaintiff dated October 13, 1999, Ex. B. to Compl.; IBM 56.1 ¶¶ 47–48; Pl. 56.1 Resp. IBM ¶¶ 47–48.) While plaintiff contacted Choicepoint concerning the problems he perceived with the First Report, over the next several days he was unable to present additional evidence concerning the dismissal of his conviction necessary to prompt a reconsideration by IBM of its intended decision to withdraw the offer. By letter dated October 18, 1999, IBM informed plaintiff that the offer was formally withdrawn. (IBM 56.1 ¶ 49; Pl. 56.1 Resp. IBM ¶ 49; Letter from IBM to plaintiff dated Oct. 18, 1999, Ex. T to Lauri Aff.)

According to IBM, on or about October 11, 1999, IBM made the decision to reduce the staff of its marketing department. At a certain point, Spencer purportedly determined that the marketing manager position for which plaintiff had applied would not be filled and the job posting was deleted on October 26, 1999. Plaintiff's name purportedly remains in IBM's computer resume database, and IBM states that he has been considered for other positions, most recently in January 2000. (IBM 56.1 ¶¶ 50–52.)

Following the withdrawal of the employment offer, and as a result of plaintiff's complaint to Choicepoint, Choicepoint obtained his California court file, and, upon review of the file, issued an amended report to IBM (the "Second Report"). (Pl. 56.1 IBM ¶¶ 75–76; IBM 56.1 Resp. ¶¶ 75–76.) The Second Report, which IBM received on October 20, 1999, contains no mention of plaintiff's conviction, and reflects a clear record. (Ex. C to Compl.) Certain of IBM's Human Resources staff who had considered the First Report, including Brown, Bailey and Carson, received and examined the Second Report. (Pl. 56.1 IBM ¶¶ 79–81; IBM 56.1 Resp. ¶¶ 79–81; Exs. 10, 16 to Antollino IBM Decl.) However, IBM did not re-offer the marketing manager position to plaintiff. (Pl. 56.1 IBM ¶ 78; IBM 56.1 Resp. ¶ 78.) Spencer testified that she finds it difficult to imagine a circumstance where she would hire plaintiff, because he failed to reveal the vacated conviction. (Pl. 56.1 IBM ¶ 83; IBM 56.1 Resp. ¶ 83.)

## C. Instant Action

Plaintiff filed an action against IBM and Choicepoint, Inc. on November 12, 1999, and an Amended Complaint on December 2, 1999. Plaintiff filed an action against two of Choicepoint's subsidiaries, Choicepoint Services, Inc. and Choicepoint Business and Government Services, Inc., on December 29, 1999. The two cases were consolidated on April 14, 2000.

Plaintiff alleges that IBM violated Sections 296(15) and 296(16) of the NYSHRL on the ground that IBM withdrew its offer of employment based on plaintiff's conviction. He also alleges that IBM violated the FCRA, 15 U.S.C. §§ 1681b(b)(1)(A), 1681b(b)(3) ("Sections 1681b(b)(1)(A) and 1681b(b)(3)") because it took adverse action against plaintiff without properly giving him notice that it was taking such action, and without properly certifying to Choicepoint that, *inter alia*, it would provide such notice. IBM now moves for summary judgment on each of plaintiff's claims; plaintiff cross-moves for summary judgment solely as to his Section 296(16) and FCRA claims. Plaintiff also moves to strike IBM's affirmative defense of unclean hands.[15]

---

15. While plaintiff moves to "dismiss" certain of IBM's and Choicepoint's affirmative defenses as part of his motion for summary judgment, the Court construes plaintiff's motion as a motion to strike such defenses pursuant to Fed.R.Civ.P. 12(f) ("Rule 12(f)"). It further notes that, while the motion is untimely, the Court clearly has the authority at any

Plaintiff alleges that Choicepoint violated the FCRA in not properly providing information concerning his conviction to IBM under the terms of the Act, in particular 15 U.S.C. §§ 1681b(b)(1)(A), 1681e(b) ("Section 1681e(b)"), and 1681k ("Section 1681k"). He also asserts that Choicepoint violated Section 349 of the New York General Business Law by engaging in deceptive acts and practices with respect to its contract with IBM concerning the provision of such information. Plaintiff now moves, and Choicepoint cross-moves, for summary judgment on each of these claims. Plaintiff also moves to strike Choicepoint's third affirmative defense of unclean hands, and its sixth affirmative defense as it pertains to Inquest, the third-party contractor hired by Choicepoint. This latter defense, which the parties refer to as the "third party liability" defense, asserts that Choicepoint is not liable for certain damages alleged by plaintiff, because such damages resulted from the acts or omissions of entities other than Choicepoint.

## II. Discussion

### A. Summary Judgment Standard

A district court may grant summary judgment only if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, which may be satisfied if it can point to the absence of evidence necessary to support an essential element of the non-moving party's claim. *Goenaga v. March of Dimes Birth Defects Found.*,

time to consider a motion to strike. Rule 12(f); *Wine Markets Int'l, Inc. v. Bass*, 177

51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All inferences and ambiguities are resolved in favor of the party against whom summary judgment is sought. *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted).

If the moving party meets its burden, the opposing party must produce evidentiary proof in admissible form sufficient to raise a material question of fact to defeat the motion for summary judgment, or in the alternative, demonstrate an acceptable excuse for its failure to meet this requirement. *AGV Prods., Inc. v. Metro-Goldwyn-Mayer, Inc.*, 115 F.Supp.2d 378, 386 (S.D.N.Y.2000); *see also Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) ("[W]here the moving party has attempted to demonstrate that the non-moving party's evidence is insufficient as a matter of law to establish his claim, the burden shifts to the nonmoving party to come forward with persuasive evidence that his claim is not 'implausible'.") (citation omitted). When reasonable minds could not differ as to the import of the proffered evidence, then summary judgment is proper. *Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). Moreover, "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996). On cross-motions for summary judgment, the rule governing inferences and burdens of proof is the same as for a unilateral summary judgment motion. *AGV Prods.*, 115 F.Supp.2d at 386 (citing *Straube v. Fla. Union Free Sch. Dist.*, 801 F.Supp. 1164, 1174 (S.D.N.Y.1992)). That

F.R.D. 128, 133 (E.D.N.Y.1998).

is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts. *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir.1988) (citing *Eastman Mach. Co., Inc. v. United States*, 841 F.2d 469, 473–74 (2d Cir.1988)).

The Supreme Court has noted that summary judgment is inappropriate when a case will turn on credibility determinations. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Moreover, courts are hesitant to grant summary judgment when intent and state of mind are at issue. *See, e.g., Gallo*, 22 F.3d at 1224. However, "although the ultimate issue of a defendant's intent in taking the ... action often is disputed, that alone is not sufficient to defeat a motion for summary judgment." *Rosen v. Columbia Univ.*, No. 92 Civ. 6330(AGS), 1995 WL 464991, at *5 (S.D.N.Y. Aug.7, 1995).

## B. NYSHRL Claims Against IBM

### 1. Section 296(15)

█ Section 296(15) prohibits a private employer from discriminating against an individual applicant, through denial of employment, on the basis of prior criminal convictions or the perception of such convictions.[16] The legal framework governing burdens of proof in an employment discrimination action is well settled, and was recently clarified by the Second Circuit in

*James v. New York Racing Assoc.*, 233 F.3d 149 (2d Cir.2000). A "minimal" prima facie case of employment discrimination requires a showing of (i) membership in a protected class, (ii) qualification for the position, (iii) an adverse employment action, and (iv) preference for a person not in the protected class. *See id.* at 153–54 (construing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If the plaintiff makes out the prima facie case, a presumption of discrimination arises. This shifts the burden of production to the defendant to proffer a nondiscriminatory reason for its challenged action or actions. *See id.* at 154. If the defendant provides such a nondiscriminatory reason, the presumption of discrimination is eliminated. *See id.* The burden of persuasion remains with the plaintiff at all times; ultimately it is the plaintiff's responsibility to convince the trier of fact that illegal discrimination occurred. *See id.* Thus, if the defendant proffers a nondiscriminatory reason for his actions and the plaintiff cannot "point to evidence that reasonably supports a finding of prohibited discrimination," the defendant is entitled to summary judgment. *Id.* (citing *Fisher v. Vassar College*, 114 F.3d 1332 (2d Cir.1997)); *cf. Kravit v. Delta Air Lines*, No. CV–92–0038, 1992 WL 390236, at *2 (E.D.N.Y. Dec.4, 1992) (applying the above legal framework to a Section 296(15) claim); *Ferrante v. Am.*

---

**16.** Section 296(15) provides in pertinent part:

It shall be an unlawful discriminatory practice for any person ... corporation or association ... to deny any license or employment of any individual by reason of his having been convicted of one or more criminal offenses, or by reason of a finding of a lack of "good moral character" which is based upon his having been convicted of one or more criminal offenses, when such denial is in violation of the provisions of Article 23–a of the N.Y. Correction Law. The pertinent section of the New York Correction Law, Section 752, provides that no

application for any license or employment shall be denied by reason of the applicant having been previously convicted of a criminal offense unless (i) there is a direct relationship between the previous criminal offense and the specific license or employment sought, or (ii) the issuance of the license or the granting of the employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public. IBM's policy governing its review of criminal convictions, discussed *supra*, appears drafted to comply with Section 296(15) as it incorporates Section 752.

*Lung Assoc.*, 90 N.Y.2d 623, 629–31, 665 N.Y.S.2d 25, 687 N.E.2d 1308 (1997) (applying the above framework to a Section 296 claim for age discrimination).

Evidence that the employer's proffered explanation is false "may or may not be sufficient to sustain a finding of discrimination." *James*, 233 F.3d at 156–57 (construing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). As the Supreme Court stated in *Reeves*, a trier of fact may conclude that an employer unlawfully discriminated where "plaintiff has established a prima facie case and set forth sufficient evidence to reject the [employer's] explanation." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. "Once the employer has given an explanation, there is no arbitrary rule or presumption as to sufficiency." *James*, 233 F.3d at 157. "The way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." *Id.* In particular, the Court should consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097; *see also James*, 233 F.3d at 156.

Here, IBM concedes, for the purposes of its motion, that plaintiff has stated a prima facie case with regard to IBM's withdrawal of plaintiff's conditional employment offer.[17] (IBM's Memorandum of Law in Support of its Motion for Summary Judgment ("IBM Mem.") at 12.) IBM then

proffers a non-discriminatory reason for its action, namely, that plaintiff lied on his employment application. Thus, the Court's analysis properly centers on plaintiff's ability to present evidence that would allow a reasonable jury to conclude that the withdrawal of his offer resulted from prohibited discrimination, i.e. IBM's consideration of the fact and/or details of the conviction itself.

■ "It is well settled that a misstatement of a material fact on an employment application is a sufficient non-discriminatory ground for an employer's refusal to hire." *Kravit*, 1992 WL 390236, at *2 (citing *New York Stock Exchange, Inc. v. New York State Div. of Human Rights*, 37 A.D.2d 941, 325 N.Y.S.2d 778, 780 (1st Dep't 1971); *Grant v. State Comm'n for Human Rights*, 54 Misc.2d 775, 283 N.Y.S.2d 486 (Sup.1967)). However, plaintiff argues that IBM's explanation that plaintiff lied on his application is false in light of the fact that, contrary to IBM's contention, (i) plaintiff's conviction was "expunged" under California law, which allowed him not to disclose it to IBM under the terms of the SDS, and (ii) none of the exceptions to non-disclosure listed on the California Order applied to plaintiff. Moreover, plaintiff argues that (iii) although IBM "had abundant evidence in its possession" that would indicate that plaintiff did not lie on his application, (a) its employees were not sufficiently familiar with the legal concepts necessary to conclude that plaintiff did or did not lie, and (b) did not reconsider their decision in light of the contents of the Second Report, which indicated that plaintiff had not lied.[18]

---

**17.** IBM does not concede that plaintiff's conviction was "terminated in his favor" for the purposes of his Section 296(16) claim. (IBM's Memorandum of Law in Further Support of its Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial

Summary Judgment ("IBM Mem. Fur. Supp.") at 13 n. 16); *see* Part II.B.2, *infra*.

**18.** Plaintiff also claims that, under New York law, he was not required to reveal his conviction because it was a criminal proceeding

(Plaintiff's Memorandum of Law in Support of His Motion for Partial Summary Judgment Against IBM and in Opposition to IBM's Motion for Summary Judgment ("Pl.Mem.IBM") at 7–30; IBM Mem. Fur. Supp. at 5–20.) The Court addresses each of these points in the context of whether "[IBM's] explanation is unworthy of credence," *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097, and their overall probativeness of the ultimate question on plaintiff's Section 296(15) claim, namely, whether IBM denied plaintiff employment "by reason of his having been convicted" of a criminal offense. Section 296(15).

First, it is undisputed that plaintiff's conviction was "vacated" and "dismissed" under Section 1203.4, a California statute. When IBM informed him that it intended to withdraw the conditional job offer based on that conviction, plaintiff related what the California Order stated: that his conviction was vacated and the charges dismissed. IBM's Human Resources staff subsequently came to the conclusion that plaintiff had lied on the SDS based, in part, on plaintiff's comments to Brown and, specifically, the fact that "plaintiff did not advise Ms. Brown that the conviction had been 'expunged' or 'sealed.'" (IBM 56.1 ¶ 35.) While there is no possibility of ambiguity as to whether plaintiff's conviction was sealed—the relevant court records, after all, were freely disclosed to Choicepoint's contractor (*see* Declaration of Eric Jon Taylor dated Aug. 14, 2000 ("Taylor Decl."), Ex. E)—the issue of whether his conviction was "expunged" under California law is far from clear. While the California Supreme Court has not directly ruled on the issue, numerous California courts have stated, both directly and indirectly, before and after the events in this case occurred, that a dismissal under

Section 1203.4 amounts to the "expungement" of a conviction. *See, e.g., Stephens v. Toomey,* 51 Cal.2d 864, 338 P.2d 182, 185–86 (1959) (stating that, upon a Section 1203.4 dismissal, the probationer is "entitled to . . . have the proceedings expunged from the record"); *People v. Acuna,* 77 Cal.App.4th 1056, 92 Cal.Rptr.2d 224, 226 (2d Dist.2000) (discussing the availability of "expungement" under Section 1203.4 for plaintiff's conviction for child molestation); *Krain v. Med. Bd. of Cal.,* 71 Cal.App.4th 1416, 84 Cal.Rptr.2d 586, 591 (1st Dist. 1999) (discussing misdemeanor conviction that was "expunged under the authority of [Section 1203.4]"); *People v. Field,* 31 Cal. App.4th 1778, 37 Cal.Rptr.2d 803, 808 (4th Dist.1995) ("The California Legislature has seen fit to render convictions expunged pursuant to section 1203.4 . . ."); *People v. Butler,* 105 Cal.App.3d 585, 164 Cal.Rptr. 475, 476 (4th Dist.1980) ("Section 1203.4 allows any convicted felon or misdemeanant who has been granted probation to petition to have his record expunged, after the period of probation has terminated."); *Adams v. County of Sacramento,* 235 Cal. App.3d 872, 1 Cal.Rptr.2d 138, 141 (3d Dist.1992) ("In California, expungement of a conviction is governed by [Section 1203.4]."). Other courts have come to contrary conclusions. *See, e.g., People v. Frawley,* 82 Cal.App.4th 784, 98 Cal. Rptr.2d 555, 559–60 (1st Dist.2000) ("While a number of courts have used forms of the word 'expunge' to describe the relief made available by section 1203.4, the statute does not in fact produce such a dramatic result . . . Section 1203.4 does not, properly speaking, 'expunge' the prior conviction. The statute does not purport to render the conviction a legal nullity."); *Able Cycle Engines, Inc. v. Allstate Ins. Co.,* 84 A.D.2d 140, 445 N.Y.S.2d 469, 473 (2d

---

terminated in his favor. (Pl. Mem. IBM at 9–11.) The Court finds this argument unavailing in light of the Court's ruling on plaintiff's Section 296(16) claim, *infra.*

Dep't 1981) (noting that a dismissal under Section 1203.4 does not amount to "complete expungement").[19] In addition, while those courts referring to Section 1203.4's remedy as an expungement acknowledge that the section was never intended to "obliterate the fact that defendant has been finally adjudged guilty of a crime," *see Adams*, 1 Cal.Rptr.2d at 141 (citing *In re Phillips*, 17 Cal.2d 55, 109 P.2d 344 (1941)), those cases recognize that the ex-offender is freed from "certain 'penalties and disabilities' of a criminal or like nature." *Id.* (citing *Copeland v. Dept. of Alcoholic Bev. Control*, 241 Cal.App.2d 186, 50 Cal.Rptr. 452 (2d Dist.1966); *Kelly v. Municipal Court*, 160 Cal.App.2d 38, 324 P.2d 990 (1st Dist.1958)). Although the section may prevent individuals from being considered for certain forms of public sector or state-sanctioned employment or licenses, the policy considerations underlying Section 1203.4 appear to support the notion of expungement where, as in the instant case, an individual applies for private sector employment. *Cf. id.* at 143–44, 235 Cal.App.3d 872 (holding that preclusion from public sector employment as peace officer was not kind of penalty or disability which was eliminated by expungement of conviction); *Frawley*, 98 Cal.Rptr.2d at 559 (noting that the "expungement" effect of Section 1203.4 is limited, because such dismissals do not release an individual from certain penalties or disabilities relating to public sector certification, such as obtaining or maintaining a medical or legal license or teaching in elementary or secondary schools). On the basis of the above, it is clear that, as

plaintiff contends, IBM cannot prove that plaintiff's conviction was not expunged. However, the Court declines to find that the conviction was expunged because the issue is subject to multiple interpretations in the California courts. The fact that plaintiff's conviction may have been expunged under Section 1203.4 merely raises an issue as to the reasonableness of IBM's belief that plaintiff lied on his application.

Second, IBM argues that the California Order itself required plaintiff to disclose the conviction. Each of the employees who was involved in the decision on plaintiff's application examined the Order, and at least two of them, Carson and Ketzel, affirmatively concluded that the Order's language requiring plaintiff to "disclose the above-referenced conviction to any direct question contained in any *questionnaire* " applied to the SDS. (Carson Dep., Ex C to Lauri Aff., at 38–42; Ketzel Dep., Ex. G to Lauri Aff., at 37–38) (emphasis added). This conclusion appears to conflict with the plain meaning of Section 1203.4. In particular, (i) from a grammatical point of view, it ignores the remainder of the relevant phrase and the sentence of which it is part, and (ii) the result it produces contrasts with the policy goals of Section 1203.4. Section 1203.4 states that dismissal under its auspices "does not relieve … the obligation to disclose the conviction in response to any direct question contained in any *questionnaire or application for public office*, for licensure by any state or local agency, or for contracting with the California State Lottery."

---

**19.** IBM relies in large part on *Roberts v. New York Life Ins. Co.*, Civ. Action No. 97–55552, 1998 WL 911444, at *1 (9th Cir.(Cal.) Dec. 9, 1998), an unreported Ninth Circuit decision, for the proposition that plaintiff's conviction was not expunged. (IBM Mem. Fur. Supp. at 8–10.) However, the court in *Roberts* held that a Section 1203.4 dismissal did not mean

that plaintiff was not "convicted" of a crime for the purpose of California Labor Code § 432.7(a). While the court stated that " § 1203.4 does not wipe out a conviction for all purposes," it did not address whether the conviction in question had been "expunged" under California law.

Section 1203.4 (emphasis added); California Order. It appears to this Court, based on the structure of the clauses in this sentence, that the word "questionnaire" is modified by "public office," rather than standing alone. Admittedly, in the California Order at issue in this case, there is greater ambiguity; in particular, the clausal divisions are less clear because the comma following "public office" has been omitted and has been replaced by the word "or." Nevertheless, the requirement that a vacated conviction be disclosed in any questionnaire appears to contradict the statute's purpose in relieving an ex-offender of penalties and disabilities associated with the conviction. The two California courts which have addressed the issue have reached opposite conclusions, both in unreported decisions. *See Roberts*, 1998 WL 911444, at *1 (finding that "questionnaire" includes applications for private sector employment); *Tietgen v. City of Pomona*, 222 Cal.Rptr. 368, 370–72 (1st App. Dist.1986) (finding that applicant need not to have disclosed his conviction on an application for public employment, because that position was not for "public office").[20] Thus, IBM has not established that plaintiff was required to disclose his conviction according to the terms of Section 1203.4 or California Order. However, while the statute appears to suggest that an ex-offender need not disclose his conviction on an application for private employment, the Court need not, and does not so rule for the purposes of this motion.[21] Like the issue of expungement under Section 1203.4, the fact that the disclosure obligation is susceptible of multiple interpretations, and may in fact be contrary to what IBM believed, raises an issue as to the reasonableness of IBM's belief that plaintiff lied on his application.

Third, the deposition testimony of those employees involved in the decision to withdraw plaintiff's offer further raises a question as to IBM's rationale for the withdrawal. Such testimony, introduced by plaintiff, reveals that certain of the employees who concluded plaintiff had lied on his application were not entirely familiar with the legal concepts necessary to make that decision. Specifically, Brown testified that because the Order did not use the word "expunged" that the conviction was not expunged. (Brown Dep., Ex. 18 to Antollino IBM Decl., at 30.) However, in an e-mail expressing her concerns to Carson, Brown stated that while plaintiff told her that the charges had been dropped completely, the Order "[did] not state that he was given complete *forgiveness*." (Ex. 14 to Antollino IBM Decl.) (emphasis added). She also defined "expunged" to mean that "your record is clear," and "that it is sealed," but stated she did not know if expunged meant "sealed and expunged." (Brown Dep. at 30, 66.) By contrast, she defined "dismissed" to mean that "[the conviction] would still show." (*Id.* at 30, 67.) Finally, she equated "forgiveness" to

---

**20.** The Court does not rely on either decision in the disposition of the instant motions. The California Rules of Court concerning republication of opinions prohibit any court from relying on *Tietgen. See* Cal. R. of Court 977, 979. Ninth Circuit rules only prevent other Ninth Circuit courts from relying on *Roberts*, but the persuasive value of the opinion is significantly reduced because it is unpublished. *See* 9th Cir. R. 36–3; *Conopco v. Roll Int'l Corp.*, 75 F.Supp.2d 196, 201 (S.D.N.Y. 1999) (finding that unpublished Ninth Circuit opinion was "not binding precedent," but adopting the court's reasoning because it was directly on point).

**21.** In this regard, the Court points to the ambiguity of the statute and the contrary court holdings on the reach of an ex-offender's disclosure obligations. Moreover, even if the statute's terms were not ambiguous, it is not clear if the listed exceptions non-disclosure of define the universe of obligations.

"cleared," but not to "expunged," which, as noted *supra,* she also defined in terms of a clear record. (*Id.* at 67.)

Carson testified that he had dealt with differences in legal terminology from different states on approximately five or six occasions since beginning his work for the company's Policies and Practice Division in 1993. (Carson Dep., Ex. 6 to Antollino IBM Decl., at 43–44; Pl. 56.1 IBM ¶ 31; IBM 56.1 Resp. ¶ 31.) He testified that he is aware of such differences pertaining to a situation where a court has sealed or otherwise disposed of a criminal record. (Pl. 56.1 IBM ¶ 31; IBM 56.1 Resp. ¶ 31.) However, he stated that he did not know what the California Order meant when it said that "the finding of guilty [was] set aside and the Court dismissed the action"; yet he concluded, without relying on the advice of any attorney, that plaintiff's conviction had not been expunged. (Carson Dep. at 41–42, 47–48; IBM 56.1 Resp. ¶ 42–43.) He further testified that if he were asked to consider the reversal of a conviction on appeal arising in any jurisdiction, he would consult with IBM's attorneys to determine how to proceed in evaluating the applicant. (Carson Dep. at 46–47; Pl. 56.1 IBM ¶ 41; IBM 56.1 Resp. ¶ 41.)

Ketzel stated that plaintiff lied on his employment application because "[h]e said he has not been convicted and he has." (Ketzel Dep., Ex. 5 to Antollino IBM Decl., at 20.) Ketzel acknowledged that if plaintiff had a conviction that was "expunged" and he answered "no" to the question regarding prior convictions, he would have been telling the truth. (*Id.* at 20.) Ketzel concluded that the conviction was not "expunged," and that plaintiff lied, on the basis of "input from [Brown]," the First

Report, and the California Order.[22] (*Id.* at 21–22; Pl. 56.1 IBM ¶ 51; IBM 56.1 ¶ 51.) However, he testified that he was unsure what "vacated" means, in the context of the Order's dismissal of plaintiff's conviction, and that he does not know what "expunged" means. (Ketzel Dep. at 22, 26, 36.) Nevertheless, Ketzel expressed his view and that of the Human Resources staff regarding withdrawal of the offer to Spencer, and in turn to Damassa. Spencer apparently understood from Ketzel that plaintiff had been convicted of a crime which he should have reported on his SDS. (IBM 56.1 Resp. ¶ 54, Spencer Dep., Ex. 4 to Antollino IBM Decl., at 88.) She testified that she did not "understand the legalities, the fine details of a vacated conviction versus a non-vacated conviction." (*Id.* at 43.) Yet, relying on the advice of Ketzel and without reviewing any document, she decided that plaintiff had lied on the application and that "the trust necessary to initiate an employment relationship did not exist." (*Id.* at 47–48, 54, 86, 88; IBM 56.1 Resp. ¶ 55.)

Fourth, following plaintiff's complaint to Choicepoint concerning the alleged inaccuracies in the First Report, Choicepoint provided a Second Report to IBM that reflected that plaintiff's record was clear. Seeking to minimize the importance of the Second Report, IBM points out that the Report was not received until October 20, 1999, after IBM had withdrawn plaintiff's offer of employment, and therefore "had no bearing upon IBM's conclusion that plaintiff lied . . . ." (IBM 56.1 ¶ 78.) This argument ignores the possibility of IBM's reconsideration of the withdrawal and re-extension of the offer. Such disregard of the contents of the Second Report is probative of the falsity of IBM's explanation

**22.** IBM appears to assert both that (i) Ketzel merely agreed with Brown's, and the "staffing organization's" recommendation that the conviction was not expunged, and (ii) himself made such determination. (IBM 56.1 Resp. ¶¶ 49, 51.)

for the withdrawal of plaintiff's offer.[23] In support of its explanation that plaintiff's alleged misstatement was the reason for the withdrawal, IBM introduces the testimony of Choicepoint's record manager, Andrew Klaer, who stated that the First Report was, in fact, accurate, and the Second Report inaccurate. In particular, Klaer stated that the Second Report's exclusion of the conviction was based solely on information provided by plaintiff, because it is "Choicepoint's practice to favor the consumer if anything is disputed."[24] (IBM Mem. Fur. Supp. at 11–12; Klaer Dep. at 52–54, 59–62.) Such testimony is questionable, because it reflects a practice that is antithetical to the principles of accuracy upon which Choicepoint's work depends; moreover, it is contradicted by (i) evidence in Choicepoint's records that the First Report was inaccurate, (Choicepoint Tracking Database form dated Oct. 14, 1999, Ex. L to Antollino Choicepoint Decl. (reflecting that the contractor "miss[ed]" certain information upon his first investigation)), and (ii) an e-mail from Brown indicating that the First Report was clearly "incorrect," and recommending its destruction, (Ex. 10 to Antollino IBM Decl.). Finally, the fact that Spencer decided to eliminate the position for which plaintiff applied shortly after plaintiff's offer was withdrawn raises additional questions as to IBM's rationale for the withdrawal. (IBM Mem. Fur. Supp. at 11 n. 14.)

Examining the entire record, construing the facts implicated by the four points above in the light most favorable to plaintiff, and resolving all inferences and ambiguities in his favor, plaintiff has raised questions with regard to the truth of IBM's proffered explanation. However, contrary to plaintiff's suggestion, he need not only allege a prima facie case and "a question as to whether IBM actually believed that plaintiff lied" in order to demonstrate the pretext necessary to survive a motion for summary judgment on his Section 296(15) claim. (Pl. Mem. at 28–29.) Plaintiff must make a substantial showing that IBM's explanation was false. *See Reeves*, 530 U.S. at 144, 120 S.Ct. 2097; *cf. Weiser v. Forest Pharmaceuticals, Inc.*, No. 99 Civ. 1809, 2001 WL 293951, at *6 (S.D.N.Y. Mar.26, 2001) ("The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].") Plaintiff has failed to do so here. He has established that there are questions under California law as to whether his conviction was expunged, and whether he was required to disclose his conviction on IBM's SDS. Further, it may be that those IBM employees who were involved in the decision to withdraw plaintiff's employment offer concluded that he had lied in undue haste and without adequate consideration of the difficult legal principles that were directly implicated by the decision. Moreover, their

---

**23.** The Court notes that the Second Report does not indicate that plaintiff did not lie on his application for employment, i.e. that the conviction was expunged or sealed. It merely reflects Choicepoint's acknowledgment of the Section 1203.4 dismissal in light of plaintiff's complaint. There is nothing in the record, for example, suggesting that Choicepoint is authorized to, or did, structure its disclosures on the basis of IBM's SDS, or upon the principles of law of the state from which the information is obtained, in this case California.

**24.** IBM specifically states that the Second Report "does not evidence that Plaintiff did not lie, but merely reflects that Plaintiff told Choicepoint his conviction was 'vacated' and requested it not be reported, and Choicepoint accommodated the request." (IBM Mem. Fur. Supp. at 12.)

failure to consider the evidence contained in the Second Report, coupled with their disregard of the conclusions of that Report on questionable grounds, suggests that their initial decision as to plaintiff's withdrawal was inflexible, which in turn suggests that there may have been deeper issues behind that withdrawal than plaintiff's alleged misstatement on his application. However, as IBM points out, "[p]laintiff does not cite any testimony or documentation showing [that] Olwyn Spencer, the individual who ultimately decided to withdraw the offer, or any other individual involved in the decision, did not believe [p]laintiff lied." (IBM Mem. Fur Supp. at 10–11.) In fact, the voluminous testimony of IBM's employees, and the communication among themselves on the issue of plaintiff's application was completely consistent: each believed, having examined plaintiff's SDS, the Choicepoint Report, and the California Order, that plaintiff lied on his application because he had not disclosed his vacated conviction.

Because plaintiff has failed to present substantial evidence as to the falsity of that explanation, so as to eliminate IBM's justification for its adverse action, this evidence, on its own, is insufficient to raise an inference of prohibited discrimination.[25] *See Reeves*, 530 U.S. at 149, 120 S.Ct. 2097 (holding that "[a] prima facie case and *sufficient evidence to reject the employer's explanation* may permit a finding of liability") (emphasis added).

Moreover, plaintiff has not set forth any additional facts that would raise an inference of discrimination. Nothing in the record indicates that IBM's rationale for withdrawing the employment offer was based on the fact of plaintiff's conviction, rather than the fact that he lied on his application, or another reason. In fact, the nature of IBM's established policy concerning its consideration of convictions in the employment process, which *is* in the record, suggests an alternative reason. As noted *supra*, that policy tracks Section 296(15), incorporating New York Correc-

**25.** Substantial evidence of falsity of an employer's explanation may lead to an inference of prohibited discrimination in cases similar to the instant one. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 517, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination.") In particular, the alleged belief that a plaintiff has lied about a conviction is grounded in the existence of the conviction. (*See, e.g.,* Spencer Dep. at 87–88 (stating that she discussed with Ketzel "[t]he fact that Abel had declared on his application form that he hadn't got convicted, the fact that this conviction had come to light . . . my deliberation was around the fact that *there had been a conviction and there hadn't been one documented in the application*")); Ketzel Dep. at 26 (stating, with respect to his decision-making process, that he "was presented with a set of facts from [K]athy Brown and asked to meet with management [that would decide] if they wanted to go forward with an offer of employment or not

based on the view that the application was not complete and that he had a conviction he didn't tell us about") (emphasis added). Where there is a fine distinction between a defendant's non-discriminatory explanation for a denial of employment (e.g., plaintiff lied about his conviction) and the discriminatory explanation (e.g., plaintiff's conviction), rejection of the non-discriminatory explanation may, in certain cases, lead to an inference of discrimination. *Cf. Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt . . . once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.") (citations and internal quotations omitted).

tion Law § 752, which permits an employer to discover a prospective employee's past conviction, and deny employment to him where, *inter alia,* "the issuance of the license or the granting of employment would involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public." Section 296(15); (IBM 56.1 ¶¶ 21–23; Pl. 56.1 Resp. ¶¶ 21–23.) IBM's disregard of the information contained in the Second Report, as well as Spencer's reticence to consider plaintiff for another position, may plausibly be explained by the rationale underlying such policy, namely, that IBM was concerned about the welfare of its employees and, its ultimate concern, the success of its business.[26]

Having considered "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case," *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097, the Court finds that plaintiff has failed to raise a triable issue of fact as to whether IBM's withdrawal of his employment offer resulted from the fact of his conviction so as to constitute prohibited discrimination under Section 296(15). Accordingly, the Court grants IBM's motion for summary judgment on this claim.

**2. Section 296(16)**

Section 296(16) prohibits an employer from making an inquiry into or taking an adverse action with respect to the arrest or criminal accusation of an individual which was terminated in the individual's favor.[27] IBM contends that plaintiff's Section 296(16) claim must be dismissed because the criminal proceedings against plaintiff were not "terminated in his favor." (IBM Mem. Fur. Supp. at 12–20.) The Court agrees.

According to Section 296(16), whether a criminal proceeding was terminated in an individual's favor is governed by Section 160.50 of the New York Criminal Procedure Law ("Section 160.50"). This section lists several instances where a criminal action shall be considered terminated in favor of the accused. *See* Section 160.50(3). The New York Court of Appeals has found that such list "encompasses an expansive class of dispositions, including acquittal and various specified dismissals and vacaturs, regardless of whether premised on grounds unrelated [sic] to guilt or innocence." *Matter of Hynes,* 47 N.Y.2d 659, 663, 419 N.Y.S.2d 942, 393 N.E.2d 1015 (1979). That court has also stated that Section 160.50 embodies "the legislative recognition of the importance of protecting individuals from having dismissed criminal charges consid-

---

**26.** Plaintiff's contention that such policy was not employed in the instant case is unsupported by the record. (Pl. Mem. IBM at 30.) The fact that Spencer may have focused her deliberations on whether plaintiff lied on his application does not foreclose the possibility of an additional ground, e.g., the conviction itself, or the fact that plaintiff might not be suited for the position given his criminal record.

**27.** Section 296(16) provides in pertinent part: It shall be an unlawful discriminatory practice, unless specifically required or permitted by statute, for any person, agency, bureau, corporation or association, including

the state and any political subdivision thereof, to make any inquiry about, whether in any form of application or otherwise, or to act upon adversely to the individual involved, any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, in connection with the licensing, employment or providing of credit or insurance to such individual.

ered in connection with their employment." *Matter of Joseph M.*, 82 N.Y.2d 128, 132, 603 N.Y.S.2d 804, 623 N.E.2d 1154 (1993).

Plaintiff asserts that his conviction was "terminated in his favor" because it was vacated and dismissed pursuant to Section 1203.4. (Pl. Mem. IBM at 23–25.) No court has determined whether a disposition under Section 1203.4 is "terminated in favor" of the accused within the meaning of Section 160.50. Noting that under New York Executive Law § 300, the provisions of the NYSHRL "must be liberally construed to accomplish the purposes of the statute," *Cahill v. Rosa*, 89 N.Y.2d 14, 20, 651 N.Y.S.2d 344, 674 N.E.2d 274 (1996), plaintiff asserts that the disposition under Section 1203.4 may be compared to an adjournment in contemplation of dismissal ("ACD") under New York Criminal Procedure Law Section 170.55, which is included in 160.50. (Pl. Mem. IBM at 24); *see* Section 160.50(3)(b) ("[A] criminal action or proceeding against a person shall be considered terminated in favor of such person where ... an order to dismiss the entire accusatory instrument against such person pursuant to section 170.30, 170.50, *170.55*, 170.56, 170.75, 180.70, 210.20, or 210.46 of this chapter ... was entered or deemed entered ...") (emphasis added). The Court disagrees. The specific nature of the relief and the procedural posture of cases encompassed by each statute are markedly different. Under New York law, an ACD is neither a conviction nor an acquittal. *Hollender v. Trump Village Coop., Inc.*, 58 N.Y.2d 420, 423, 461 N.Y.S.2d 765, 448 N.E.2d 432 (1983). Rather, after arraignment but before the entry of a plea of guilty or the commencement of a trial, the defendant is released from custody on his own recognizance. If, within six months of the issuance of the ACD, the action is not restored to the active calendar by the court upon the mo-

tion of the government, the charges will be dismissed automatically and, pursuant to Section 160.50, the record is sealed unless the court finds it is not in the interests of justice. Section 170.55; Section 160.50(1). The statute explicitly states that:

> The granting of an adjournment in contemplation of dismissal shall not be deemed to be a conviction or an admission of guilt. No person shall suffer any disability or forfeiture as a result of such an order. Upon the dismissal of the accusatory instrument pursuant to this section, the arrest and prosecution shall be deemed a nullity and the defendant shall be restored, in contemplation of law, to the status he occupied before his arrest and prosecution.

Section 170.55(8). In contrast, Section 1203.4 dismissals apply to existing convictions effected by a plea of guilty before trial or a finding of guilt by a jury, and are only entered after a specified period of probation. The charges are not automatically dismissed, but the accused must petition the Court before any action is taken. Once the plea or verdict of guilty is withdrawn and the charges dismissed, plaintiff is not released from all penalties and disabilities resulting from the conviction; as noted *supra*, at a minimum, individuals may still prevented from being considered for certain forms of public sector or state-sanctioned employment. The statute itself requires individuals to report their conviction in certain public settings, and, "in any subsequent prosecution of the defendant for any other offense, the prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed." Section 1203.4. Finally, while the charges are dismissed, they are not sealed. The conviction remains in the public record, such that an employer, or a consumer reporting agency, may discover

them as part of a background check. Accordingly, even liberally construing the provisions of Section 296(16) and the provisions of Section 160.50 incorporated by reference therein, the Court finds that Section 1203.4 relief is not analogous to an ACD.[28]

Plaintiff also compares Section 1203.4 relief to a dismissal in the "interest (or furtherance) of justice," which is one of the favorable terminations specified under New York Criminal Procedure Law § 170.30 ("Section 170.30"). The remedy itself is detailed in New York Criminal Procedure Law § 170.40 ("Section 170.40"). Like an ACD, this form of relief is neither an acquittal nor a determination on the merits; it leaves the question of guilt or innocence unanswered. *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 504, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984). Under Section 170.40, "as a matter of judicial discretion," a court may dismiss "a simplified traffic information, a prosecutor's information or a misdemeanor complaint, or any count thereof" in the interest of jus-

tice, after arraignment upon such accusatory instrument. Section 170.40. The court must point to a "compelling factor, consideration, or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such accusatory instrument or count would constitute or result in injustice." Section 170.40. Such remedy is clearly not analogous to Section 1203.4, which provides a specific process for post-conviction relief and directs the court to dismiss the charges if the conditions of probation have been satisfied and the individual "is not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense." Section 1203.4. Moreover, as IBM points out, California has a statute analogous to Section 170.40 which is wholly separate from Section 1203.4. That provision, California Penal Code § 1385 ("CPC § 1385"), states that "[t]he judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, or-

---

**28.** Plaintiff relies on *In re Johnson*, 270 A.D.2d 186, 706 N.Y.S.2d 18 (1st Dep't 2000) for his contention that relief under Section 1203.4 is analogous to an ACD under New York law. In *Johnson*, the plaintiff appealed from a New York State Human Rights Commission determination that the Department of Corrections had not violated New York City Administrative Code § 8–107(11) ("Section 8–107(11)") by refusing to consider the plaintiff for employment because of his criminal record. The terms of Section 8–107(11) are parallel to those of Section 296(16). Reversing, the court found that plaintiff's former conviction was analogous to an ACD and therefore had been "terminated in his favor" under Section 160.50. Plaintiff's contention that *Johnson* is dispositive here is unavailing for three reasons. First, the *Johnson* court construed a Maryland statute governing a petition of expungement, Maryland Annotated Code § 292(b). (*See* Petition, Ex. 19 to Antollino IBM Decl.) Second, the court failed to describe the proceedings or provide a rationale for its decision, stating only that "the

Maryland criminal proceedings against petitioner were disposed of in a manner analogous to New York's adjournment in contemplation of dismissal." *Johnson*, 706 N.Y.S.2d at 19. Third, the petition for expungement, which plaintiff has provided as an exhibit to his motion papers, is similarly unclear. It merely indicates that a *Nolle Prosequi* was entered and that the accused had completed a period of probation under Section 292(b). There is no indication if there was a finding of guilt in the first instance, or the effect of the ultimate dismissal. Without such information, the Court declines to analogize Section 292(b), a Maryland statute, and Section 1203.4, a California statute, for the purposes of a comparison with Section 170.55, a New York statute. The Court notes that Maryland Annotated Code § 641, on which plaintiff bases his conclusion that there was a finding of guilt, is not reflected in either the New York court's opinion or in the record of the proceedings provided by plaintiff. (Pl. Rep. IBM at 7–8 & ns. 3–4.)

der an action to be dismissed. The reasons for the dismissal must be set forth in an order entered upon the minutes." CPC § 1385. The Court also declines to find that any of the other dispositions listed in Section 160.50 are analogous to Section 1203.4 relief.[29] Thus, because plaintiff's criminal proceeding was not "terminated in his favor" as defined by Section 160.50, the Court grants IBM's motion for summary judgment as to plaintiff's Section 296(16) claim.

### C. FCRA Claims Against IBM

Plaintiff alleges that IBM violated the FCRA, in particular 15 U.S.C. §§ 1681b(b)(1)(A), 1681b(b)(3), by (i) withdrawing plaintiff's conditional offer of employment without first providing him with a copy of the First Report and a description of rights under the Act, and (ii) failing to properly certify to Choicepoint that it would provide such forms of notice and use the information in the report for the proper purpose under the Act. As far as this Court can tell, no court has addressed claims brought under either of the above sections. The Court addresses the claims in reverse order.

■ Section 1681b(b)(3) requires that, "in using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates (A) a copy of the report; and (b) a description in writing of the rights of the consumer under this subchapter, as prescribed by the Federal Trade Commission . . . ." Plaintiff claims that such procedures were not properly followed because IBM had already "taken adverse action" by October 13, 1999, the day plaintiff received the letter from IBM's Human Resources department stating that the company intended to withdraw its conditional offer of employment. Plaintiff points to facts, discussed *supra*, indicating that IBM's internal decision-making process had been completed by October 12, the date when Ketzel met with Spencer and subsequently sent an e-mail to Damassa concerning the staff's recommendation that IBM rescind the offer. He therefore concludes that "[t]here is not a shred of evidence indicating that IBM made any decision—or intended to make any decision—*after* it sent the letter on October 13," (Pl. Mem. IBM at 26), and that "[t]he sending of the second letter [on October 18] was not a decision—it was merely a notification that a decision had been made," (Plaintiff's Reply Memorandum of Law in Further Support of His Motion for Partial Summary Judgment Against IBM ("Pl.Rep.IBM") at 14.)

Because plaintiff misinterprets the statute and misconstrues the underlying purpose of its requirements, his contention is unavailing. An internal decision to rescind an offer is not an adverse action. The FCRA defines "adverse action," *inter alia,* as the *"denial of employment or any other*

---

**29.** Section 160.50(3)(b) includes dismissals of (i) the information before a guilty plea or trial on the basis of grand jury proceedings (§ 170.50); (ii) ACDs involving marihuana (§§ 170.56, 210.46); (iii) a felony complaint after hearing (§ 180.70); and (iv) an indictment upon the issuance of such indictment (§ 210.25). The rest of Section 160.50(3) includes dismissals (v) of the accusatory instrument after an appeal (§ 3(a)); (vi) pursuant to a verdict of acquittal (§ 3(c)); (vii) pursuant to orders of the trial court, e.g. setting aside a verdict or vacating a judgment (§ 3(d)-(f)); (viii) related to habeas corpus (§ 3(g)); (ix) of charges by a grand jury (§ 3(h)); (x) by the prosecutor or arresting police agency prior to the filing of an accusatory instrument (§ 3(i)-(j)); (xi) of offenses relating to controlled substances (§ 3(k)); and (xii) pursuant to an ACD (§ 3(*l*)). None of such dispositions are analogous to dismissal under Section 1203.4.

decision for employment purposes that *adversely affects* any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii) (emphasis added). Clearly, plaintiff did not suffer any adverse effect until his offer of conditional employment was withdrawn on October 18, 1999. Plaintiff concedes this point in his own moving papers, where he states that "what matters is not what IBM said, but what IBM did." [30] (Pl. Mem. IBM at 26.) IBM's internal discussions had no impact on plaintiff; only when its staff acted by letter did IBM take any action. Holding that an employee may suffer an adverse action as a result of an internal decision by the employer is akin to finding that a party's summary judgment motion is denied before the Opinion is composed and issued, following discussions between the judge and his law clerk. The absurdity of such result is evident.[31] Moreover, the statute expressly allows for the formation of an intent to take adverse action before complying with Section 1681b(b)(3), as it states that "the person *intending* to take" adverse action must provide the report and description of rights.[32] 15 U.S.C. § 1681b(b)(3). After all, how can an employer send an intent letter without having first formed the requisite intent?

After receipt of the intent letter, plaintiff could have come forward with information responding to the First Report that showed he had not lied on his application. He attempted to do so by asking Choicepoint to reexamine his records. Such opportunity to discuss and dispute the report is exactly the scenario envisioned by the FCRA. *See* Lynne B. Barr, "The New FCRA: An Assessment of the First Year," 54 Bus. Law. 1343, 1348 (1999) (citing Letter from FTC to Employers Association of New Jersey dated Dec. 18, 1997) (stating that the "clear purpose" of the FCRA is "to allow consumers to discuss reports with employers or otherwise respond before adverse action is taken"). Because plaintiff's position that forming an intent to withdraw an employment offer is an adverse action is legally unsupportable, the Court denies his motion, and grants IBM's motion for summary judgment as to his FCRA claim under Section 1681b(b)(3).

■ Plaintiff also argues that IBM violated the FCRA because "before using a report, IBM *must certify* to Choicepoint that it will comply with the FCRA and the State Human Rights Laws." (Pl. Mem. at 27.) Plaintiff's claim is grounded in IBM's alleged failure to provide evidence of such certification during discovery. (*Id.*) Section 1681b(b)(1)(A) provides:

---

30. Plaintiff also contends that e-mail communications between Ketzel, Damassa, and Brown support his conclusion that IBM took an adverse action prior to October 18, 1999. Specifically, he points out that Ketzel's e-mail to Damassa on October 11, 1999 was entitled "Rescind Offer?" and that Ketzel's October 12 e-mail to Brown reporting Damassa's opinion was entitled "Rescind Offer!" (Pl. Rep. IBM at 13 & n. 8; Ex. 7 to Antollino IBM Decl.) However, even assuming that the title reflected Damassa's actual response, such response was a mere indication of intent, or at most a direction to act, not the act of withdrawal itself.

31. As IBM points out, such a ruling would effectively allow every employee who suffers an adverse employment action following a credit agency report to file an FCRA claim asserting that the decision was made prior to the sending of the intent letter, on the ground that the intent letter reflects that a decision has already been made. (IBM Mem. Fur. Supp. at 22.)

32. For the same reason, the Court finds unsupportable plaintiff's further contention that IBM was required to provide the required notice under Section 1681b immediately after receiving the First Report, and "before *anyone* made a determination that plaintiff had lied." (Pl. Mem. IBM at 26.)

(1) Certification from user. A consumer reporting agency may furnish a consumer report for employment purposes only if:

(A) the person who obtains such report from the agency certifies to the agency that:

(i) the person has complied with paragraph (2) with respect to the consumer report,[33] and the person will comply with paragraph (3) with respect to the consumer report if paragraph (3) becomes applicable;[34] and

(ii) information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation; and

(B) the consumer reporting agency provides with the report, or has previously provided, a summary of the consumer's rights under this subchapter, as prescribed by the Federal Trade Commission . . . .

IBM argues, based on the plain language of the statutory provision, that only the consumer reporting agency may be held liable under this subsection, not the user of the reports. The Court agrees. "In construing the terms of a statute, we look first to the language itself." *Washington v. Schriver*, 240 F.3d 101, 107 (2d Cir.2001) (citing *Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110, 119 (2d Cir.2000)). As the Second Circuit has stated:

Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent . . . . The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

*Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). Only where the meaning of a statutory provision is textually ambiguous may the Court consult its legislative history. *Id.*

Section 1681b(b)(1) sets forth the "[c]onditions for furnishing and using consumer reports for employment purposes." The section contains three subsections that set forth certain obligations for consumer reporting agencies and users such as employers. However, contrary to plaintiff's suggestion, (Pl. Rep. IBM at 14), each of the subsections need not, and does not, prescribe obligations for both agencies and users. The second and third subsections both affect users. *See* 15 U.S.C. §§ 1681b(b)(2), b(b)(3) (setting forth certain conditions for the procurement of and use of consumer reports). On the other hand, the first subsection, at issue here, sets forth obligations that an agency must satisfy before furnishing a consumer re-

---

**33.** Paragraph 2 requires in pertinent part that:

[A] person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless:

(i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure, that a consumer report may be obtained for employment purposes; and

(ii) the consumer has authorized in writing . . . the procurement of the report by that person.

15 U.S.C. § 1681b(2).

**34.** Paragraph 3 refers to 15 U.S.C. § 1681b(b)(3), discussed *supra*.

port. The plain language of the provision states that *"a consumer reporting agency may furnish a consumer report for employment purposes only if ..."* certain certifications are obtained from the user of such report. 15 U.S.C. § 1681b(b)(1); (*see* Letter from the FTC to Stephen Kilgo dated July 28, 1998, Affidavit of Kevin G. Lauri dated Aug. 23, 2000, Ex. 2 ("[W]hile an employer is required to procure the written authorization (release form) from the consumer, the [Consumer Reporting Agency] is required to obtain the employer's certification before furnishing the report").) Moreover, another section of the FCRA, 15 U.S.C. § 1681e(a) ("Section 1681e(a)"), contains an analogous requirement: the section obligates the agency to obtain certain certifications from the user and to make sure the report will be used for the purposes listed in Section 1681b. Setting forth "compliance procedures" for consumer reporting agencies, Section 1681e(a) provides that:

> Every consumer reporting agency *shall maintain reasonable procedures* designed to ... limit the furnishing of consumer reports to the purposes listed under section 1681b of this title. *These procedures* shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose.

Section 1681e(a) (emphasis added); *see Ippolito v. WNS, Inc.*, 864 F.2d 440, 454 (7th Cir.1988) (discussing this statutory provision in the context of a proposed claim against credit reporting agency); *see also* IBM–Choicepoint Agreement ¶ 9a (certification by IBM to Choicepoint's predecessor under the terms of Section 1681e(a)). Because the Court finds that the "statutory language is unambiguous and the statutory scheme is coherent and consistent," it finds that, while plaintiff may assert a claim against Choicepoint under Section 1681b(b)(1)(A), *see infra*, he has no standing to assert a claim against IBM under this section. Accordingly, plaintiff's claim under this section must be dismissed as against IBM.

## D. FCRA Claims Against Choicepoint [35]

### 1. Section 1681b(b)(1)(A)

Plaintiff alleges that Choicepoint violated 15 U.S.C. § 1681b(b)(1)(A) because it furnished a credit report to IBM concerning plaintiff without first obtaining the required certification. Choicepoint argues that this claim must be dismissed because such certification was provided to IBM.[36] It suggests that the certification is reflected in a document sent to Choicepoint by IBM, but acknowledges that it has not been able to locate such document. (Choicepoint Mem. at 18; *see* Choicepoint's Response to Plaintiff's First Combined Demand, Ex. K to Antollino Choicepoint Decl., Resp. to No. 5 (stating that Choicepoint "will produce non-privileged, relevant documents which are responsive to this Request [for evidence of certification]").)

---

**35.** Plaintiff, in his motion papers, withdraws his claims for defamation and common law negligence against Choicepoint, insofar as they are pre-empted by 15 U.S.C. § 1681h(e). (Plaintiff's Memorandum of Law in Support of His Motion for Partial Summary Judgment Against Choicepoint ("Pl.Mem.Choicepoint") at 6 n. 4; Compl. ¶¶ 48–54, 58–65.)

**36.** Choicepoint also suggests, incorrectly, that plaintiff lacks standing to assert a claim under Section 1681b(b)(1)(A). (Choicepoint Mem. at 18.) Under Sections 1681n or 1681o of the FCRA, plaintiff, who is indisputably a consumer under the Act, has a private right of action against any person who, respectively, willfully or negligently "fails to comply with *any requirement* imposed under [the FCRA]." 15 U.S.C. §§ 1681n, 1681o (emphasis added).

Choicepoint further argues that its inability to locate documentary certification is harmless error, because the statute does not require such certification to be written; and they offer an unsworn declaration from Choicepoint's National Account Manager, Jay Fearrington, who states that "representatives of IBM" have provided the required certification orally, and that he personally "heard and was aware of the representations." (Choicepoint Mem. at 18–19; Declaration of Jay Fearrington dated Aug. 14, 2000 ("Fearrington Decl.") ¶¶ 4–7.) The Court declines to accept Fearrington's testimony that oral certification statements were provided because such statements are unspecified, and in any event are inadmissible hearsay. Fed. R.Evid. 801. Fearrington also fails to indicate whether IBM representatives certified to him that "the information from the consumer report will not be used in violation of any applicable Federal or State equal employment opportunity law or regulation," which is required under the FCRA. *See* 15 U.S.C. § 1681b(b)(1)(A). Further, while Fearrington states that he was aware of IBM's alleged certification "prior to and during September of 1999," there is no indication that such certification encompassed plaintiff's case.

The Court also notes that, in the papers in support of its motion for summary judgment, IBM asserts that such certification was provided in an eight-page, internal policy document in which the company outlines the 1996 amendments to the FCRA, which included Section 1681b(b)(1)(A). However, the document merely outlines the amendments to the Act, and states that Carson would "coordinate with Choicepoint to ensure they have received appropriate certification." (Ex. X to Lauri Decl. at 88–89.) Notably, IBM never asserts that Carson provided such certification; moreover, neither IBM nor Choicepoint offers testimony to that effect by anyone at IBM.[37] (IBM Mem. Fur. Supp. at 24–25.)

■ The Court need not decide whether oral certification is sufficient under the FCRA in order to dispose of the motions on plaintiff's claim. *Cf. Black's Law Dictionary* 220 (7th ed.1997) (defining "certify" as "1. To authenticate or verify in writing. 2. To attest as being true or as meeting certain criteria."); *Webster's II New Riverside University Dictionary* 244 (1994) (defining "certify" as "[t]o confirm formally as true, accurate, or genuine, esp. in writing"). Given (i) the absence of any documentary evidence regarding certification, despite Choicepoint's assertion and IBM's implication that such document exists, (ii) the vague and inadmissible statements of Choicepoint's National Account Manager concerning the oral provision of certification, and (iii) IBM's apparent attempt to avoid the issue on the basis of a document that clearly does not support its point, the Court finds that Choicepoint has failed to demonstrate that there is any issue of material fact as to their failure to obtain the required certification before providing the First Report to IBM. The Court finds that such failure constitutes

---

**37.** Choicepoint asserts that plaintiff's Section 1681b(b)(1)(A) claim should be dismissed, in part, because "[p]laintiff served no interrogatories, no requests for admission, and no deposition notices which asked for information addressing the certification issue or 1681(b)," and because plaintiff failed to ask questions regarding certification to Choicepoint or IBM representatives. (Choicepoint Rep. at 12; *cf.*

IBM Mem. Fur. Supp. at 25 (stating that plaintiff's failure to ask Carson about certification was to avoid evidence that such certification was provided).) The Court does not accept Choicepoint's attempt to blame plaintiff for its own failure to produce evidence of certification. The mere fact that plaintiff did not request such information during discovery does not defeat his FCRA claim.

negligent, as opposed to wilful conduct, for while the record reflects that Choicepoint neglected to obtain proper certification documents from IBM, there is nothing in the record to suggest that it did so intentionally. Accordingly, the Court grants summary judgment to plaintiff on this claim.

## 2. Section 1681k

■ 15 U.S.C. § 1681k sets forth public record obligations which apply specifically in the employment context. This section requires a credit reporting agency furnishing information that is a matter of public record and which is likely to have an adverse impact on the applicant, to either (1) notify the applicant of the fact that public record information is being reported along with the name and address of the person who requested the report, *or* (2) maintain "strict procedures" designed to insure that any such reported information is "complete and up to date." 15 U.S.C. § 1681k (emphasis added). For purposes of the section, "items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported." *Id.* In this case, the threshold requirements for the application of this section are clearly met, as the information concerning plaintiff was reported for employment purposes, was a matter of public record, and was certainly likely to have an adverse impact on him. In addition, it is undisputed that Choicepoint did not notify plaintiff that his criminal record information was being reported to IBM.

Accordingly, plaintiff alleges that Choicepoint violated Section 1681k because the information that it provided to IBM was neither complete nor up to date, and Choicepoint "has no procedures—let alone strict procedures—designed to ensure that such information is complete and up to date." (Pl. Mem. Choicepoint at 6.) As far as this Court can tell, no court has had occasion to analyze the provisions of Section 1681k in the context of a claim brought pursuant to that section. The logical starting point for an analysis of Section 1681k is whether the information provided was complete and up to date. If this is so, then an inquiry into the agency's procedures is unnecessary. *Cf. Boothe v. TRW Credit Data,* 768 F.Supp. 434, 437 (S.D.N.Y.1991) (stating, in the context of a claim under 15 U.S.C. § 1681e(b), that "the threshold question ... is whether the challenged credit information is inaccurate. If the information is accurate, no further inquiry into the reasonableness of the consumer reporting agency's procedures is necessary."); *McPhee v. Chilton Corp.,* 468 F.Supp. 494, 497 (D.Conn.1978) (noting in same context that "accuracy of the final product forecloses inquiry into the reasonableness of the procedures used to produce the report"). The record reflects that, in this case, the information provided to IBM by Choicepoint was neither complete nor up to date. Rather, the First Report, dated October 1, 1999, reflected plaintiff's 1995 conviction, but not its subsequent dismissal in 1997 under Section 1203.4. Leaving aside whether the omission of the information was the fault of Choicepoint's contractor or some other entity (e.g. the court),[38] and whether the conviction itself

---

38. In this regard, the current record suggests that Choicepoint's contractor simply "miss[ed]" the information that was contained in the court's files. (Choicepoint Tracking Database form dated Oct. 14, 1999,

Ex. L to Antollino Choicepoint Decl.; Taylor Decl., Ex. E (displaying Section 1203.4 petition on plaintiff's misdemeanor docket.)) However, Choicepoint's record manager testified in his deposition that he does not know

should have been disclosed given the disposition under 1203.4, the information provided to IBM was clearly deficient because the dismissal was not mentioned. Similarly, while this information reflected one entry in the "current public record" with regard to plaintiff's criminal record in Santa Clara County, it was not up to date because it did not provide the most current information with regard to that entry, i.e., the Section 1203.4 dismissal. Choicepoint acknowledges this point in stating that "the only information which could have been included in its report which would have made it more 'complete' or 'up to date' for the purposes of the IBM application would have been information that indicated that plaintiff's conviction had either been expunged or sealed." (Choicepoint Rep. at 6–7.) Tiptoeing around its obligations, Choicepoint argues that such information was not disclosed because plaintiff's conviction was neither expunged nor sealed. (*Id.* at 7.) Such argument is unavailing. There is nothing in the record to suggest that Choicepoint is authorized to, or did, base its disclosures on the terms of IBM's SDS, despite Choicepoint's apparent suggestion that its searches were so based.[39] (*See* Choicepoint Mem. at 10–11, 13; Attachment A to IBM–Choicepoint Agreement at CS 237, 253 (defining "scope of work" as including "federal and state felony and misdemeanor court search," without specifying dispositions).) Further, (i) as noted *supra*, it is far from certain that plaintiff's conviction was not expunged under California law, and (ii) under Choicepoint's and IBM's interpretation of "expunged" and "sealed," according to which a conviction is completely stricken from the record, (Choicepoint Mem. at 11–

12, 15; Choicepoint Rep. at 9; IBM Mem. Fur. Supp. at 8–9), Choicepoint would never be able to locate and report the "additional information" it claims could have made its disclosure more complete and up to date. Moreover, Choicepoint's argument that it was entitled to rely on the public record, and that its report was "based on publically available, current information" misses the point; it was how the public record was construed by the contractor that is at issue here. (Choicepoint Mem. at 16–17; Choicepoint 56.1 Resp. ¶ 45.)

Nevertheless, on the current record, the Court declines to find that Choicepoint failed to "maintain strict procedures" designed to insure that the information concerning plaintiff was complete and up to date, thereby making Choicepoint liable for a violation of Section 1681k as a matter of law. Likewise, the Court cannot find that Choicepoint clearly maintained such strict procedures, in order to warrant an award of summary judgment to Choicepoint. Rather, there are issues of fact related to Choicepoint's investigatory procedures which would affect the determination of whether Choicepoint violated Section 1681k in the conduct of their investigations. The deposition testimony of Choicepoint's record manager, Andrew Klaer, reflects that, generally: (i) Choicepoint contracts with various "suppliers" to conduct searches, who are either "researchers," internal Choicepoint employees, or independent contractors; (ii) Choicepoint selects the low cost supplier if multiple suppliers are available; (iii) Choicepoint assumes the accuracy of the search performed by the supplier; (iv) if

what information the contractor examined in researching information for the First or Second Report. (Klaer Dep. at 63.)

**39.** The Court notes that Choicepoint devotes a substantial portion of its motion papers to the issue of "expungement" under California law. (Choicepoint Mem. at 10–12; Choicepoint Rep. at 7–10.)

there is a "hit," i.e. if a person is found to have a criminal record, the only verification provided is a check by someone at Choicepoint's employment service center in order to make sure the person on the report is identical to the person about whom the employer requested; if the identities match, Choicepoint forwards the report to the employer; (v) certain investigatory procedures are provided in a training manual provided to internal Choicepoint employees, but nothing is provided to the outside contractors; (vi) third party suppliers have an "implied" instruction to be accurate; (vii) Klaer does not know if Choicepoint has a policy or procedure with regard to reporting convictions that have been dismissed; and, as noted *supra*, (viii) when an individual complains, in generating an amended report, it is "Choicepoint's practice to favor the consumer if anything is disputed." (Pl. 56.1 Choicepoint ¶¶ 61–74; Klaer Dep. at 14–16, 36–37, 39–40, 52–54, 59–63.)

Based on this information and on the limited facts in the record surrounding the contractor's search and Choicepoint's report in this case, the Court concludes that there are questions of fact relating to the specifics of, and hence the reasonableness of, the (i) procedures used to select individuals to perform searches, (ii) the policies under which such suppliers operate and by which Choicepoint reports the final results to the employer, and (iii) the policies under which amendments to initial reports are

made. Moreover, assuming that such procedures would not meet the standard for strictness required under Section 1681k, there, are questions as to whether, based on the procedures used to investigate plaintiff's criminal record in this case, Choicepoint intentionally maintained substandard procedures, or knew or should have known that its procedures would not meet the standard.[40] Accordingly, the Court declines to grant summary judgment to either party on this claim. *Cf. Wiggins v. Equifax Servs., Inc.*, 848 F.Supp. 213, 221 (D.D.C.1993) (denying summary judgment on Section 1681k claim where issues of fact existed as to the agency's procedures and whether it acted wilfully).

### 3. Section 1681e(b)

15 U.S.C. § 1681e(b) requires that "[w]henever a consumer reporting agency prepares a consumer report *it shall follow reasonable procedures to assure maximum possible accuracy* of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (emphasis added). Plaintiff alleges that Choicepoint violated this section because it neither provided "maximally accurate" information to IBM nor has "reasonable procedures" designed to ensure such accuracy. (Pl. Mem. Choicepoint at 7.) Similar to Section 1681k, and in accordance with one of the FCRA's central purposes, Section 1681e(b) is intended to ensure the accuracy

---

40. For example, the FCRA would not logically require an agency to review the entire court file of each of the individuals it investigates. *Cf. Houston v., TRW Info. Servs.*, No. 88 Civ. 0186, 1989 WL 59850, at *1 (S.D.N.Y. May 2, 1989) ("Evaluating the reasonableness of a credit agency's procedures under § 1681e(b) involves balancing the potential harm from inaccuracy against the burden on the agency of safeguarding against such inaccuracy.") (quoting *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C.Cir.1984)); *id.* at *2 (finding

that agency had reasonable procedures where its investigators relied on court's judgment docket rather than court files). The provisions of Section 1681b(b)(3), under which the consumer receives a copy of the report before adverse action is taken and, as in this case, agency contracts specifying that plaintiff must be notified of a discrepancy between his claims and the findings of the agency, allow, at least in principle, for certain mistakes to be corrected without prejudice to the employee.

of reports generated by credit reporting agencies. *See* Section 1681e(b) ("It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."); *cf. Bryant v. TRW*, 689 F.2d 72, 78 (6th Cir. 1982) (affirming finding that, in enacting the FCRA, Congress has not intended consumer reporting agencies to act merely as conduits of information, but to be responsible for evaluating the correctness of the information they impart). However, under Section 1681e(b), the agency is held to the less specific standard of "maximal accuracy" rather than the "complete and up to date" requirement of Section 1681k, and requires that the agency only have "reasonable procedures" to ensure such accuracy, rather than the "strict" procedures required under Section 1681k. *See Equifax v. Federal Trade Commission*, 678

F.2d 1047, 1049 & n. 4 (11th Cir.1982) (noting that the distinction between the reasonable procedure standard of Section 1681e(b) and the strict procedure standard of Section 1681k is "clearly not without significance.") However, the disposition of plaintiff's respective claims under these sections are parallel in this case. Specifically, the Court finds that the information provided to IBM was not maximally accurate under Section 1681e(b), given Choicepoint's failure to report the Section 1203.4 dismissal.[41] The Court also finds that, for the reasons enumerated *supra* with respect to plaintiff's Section 1681k claim, issues of fact exist with regard to the nature of Choicepoint's investigatory procedures as applied to the instant case so as to prevent a judgment as a matter of law as to their reasonableness. Moreover, even assuming they are unreasonable, the jury must determine whether Choicepoint intentionally maintained such unreasonable procedures, or knew or should have known this to be the case. The Court therefore denies the parties' respective summary judgment motions on plaintiff's Section 1681e(b) claim.[42] *See Houston*, 707

41. The Court need not address whether a report can be "maximally accurate" for the purposes of Section 1681e(b) when information it reports has become stale between the time of its original investigation and the date the report is provided. (Pl. Mem. Choicepoint at 15–17; Pl. Rep. Choicepoint at 16); *see Houston v. TRW Info. Servs.*, 707 F.Supp. 689, 692–93 (S.D.N.Y.1989) (finding that "maximum accuracy" requires that agency make sure the report is up to date when presented even if it involves investigatory follow up). Here, it is clear that the information concerning plaintiff's dismissal was in the public record and available to Choicepoint during its initial investigation. *Cf. Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40 (D.C.Cir.1984) (stating that "reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the reports").

42. The principal cases that Choicepoint cites in support of its summary judgment motion on its Section 1681e(b) (and Section 1681k) claims are inapposite. In *Boothe v. TRW*, 768 F.Supp. 434 (S.D.N.Y.1991), plaintiff claimed his credit report was inaccurate because, while it represented he had filed for bankruptcy, it omitted plaintiff's explanation for his motivation in doing so. The Court awarded summary judgment to defendant, finding that the fact of the bankruptcy filing was all that was required for maximal accuracy. *Id.* at 437–38. Here, there is no question that Choicepoint failed to include pertinent information in the public record, namely, plaintiff's Section 1203.4 dismissal, which made the First Report less than maximally accurate. In *Grays v. Trans Union Credit Info. Co.*, 759 F.Supp. 390 (N.D.Ohio 1990), the agency reported a default judgment against the plaintiff and also stated that the judgment was "paid, vacated, dismissed with no record." The

F.Supp. at 693 (denying summary judgment on Section 1681e(b) claim where there were genuine issues regarding the reasonableness of defendant's procedures for the preparation of the credit reports at issue).

### E. Section 349 Claim Against Choicepoint

■ Plaintiff alleges that Choicepoint violated New York's consumer protection law, New York General Business Law § 349 ("Section 349"), by "mislead[ing] IBM into believing that it would exercise reasonable care in supervising and overseeing its third-party contractors." (Pl. Mem. Choicepoint at 19.) Section 349 "was designed to protect consumers from various forms of consumer fraud and deception." *Smith v. Triad Mfg. Group, Inc.*, 255 A.D.2d 962, 681 N.Y.S.2d 710, 712 (4th Dep't 1998) (citation omitted). The Section outlaws "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in [New York]." Section 349(a). In order to establish a violation of Section 349, a plaintiff must establish that (i) the conduct of the defendant is consumer-oriented; (ii) defendant is engaging in an act or practice that is deceptive or misleading in a material way; and (iii) plaintiff has been injured by reason thereof. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). The New York Court of Appeals has defined a "deceptive act or practice" as a representation or omission "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741.

■ Plaintiff's claim is insufficient as a matter of law for three reasons. First, the deception plaintiff alleges arises directly out of the IBM–Choicepoint Agreement, which sets forth the terms under which Choicepoint agreed to subcontract its work. (Pl. Mem. at 19.) By all indications, Choicepoint's conduct could only trigger a private contract dispute between the two defendants in this case, which does not "have a broader impact on consumers at large," *Oswego*, 85 N.Y.2d at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741; plaintiff lacks standing to bring such a claim under Section 349. *See Asbeka Indus. v. Travelers Indemnity Co.*, 831 F.Supp. 74, 88 (E.D.N.Y.1993) ("It is well settled that section 349 does not apply to "[a] breach of a private contract affecting no one but the parties to the contract, whether that breach be negligent or intentional, [because that conduct] is not an act or practice affecting the public interest.")" (citation and internal quotations omitted). Second, the record does not reflect that Choicepoint has engaged, or is engaging, in any materially misleading or deceptive acts. *See id.* (stating that deceptiveness, for the purposes of Section 349, involves "acting in bad faith or in an outrageous manner"); *cf. Oswego*, 85 N.Y.2d at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (noting that the statute was intended to "afford a practical means of halting consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds"). While Choicepoint's arrangements with its suppliers may be in disregard of certain of its obligations under the terms of the IBM–Choicepoint Agreement, redress for such a transgression may be pursued by way of a breach of contract claim, not a consumer protection claim. There is no evidence of fraud or wilful

Court dismissed on summary judgment, finding that the agency had provided accurate information under the FCRA, because it re-

ported all the information in the public record. *Id.* at 392–93. Here, Choicepoint failed to report the complete record.

misrepresentations. Finally, despite plaintiff's claim that he "lost a lucrative job opportunity" as a result of the work of Choicepoint's contractor, he cannot establish that he suffered injury from the alleged deceptive practices, which are grounded in the contractual arrangement between IBM and Choicepoint. The alleged deception could only have caused IBM to suffer injury. Accordingly, the Court grants Choicepoint's motion for summary judgment as to plaintiff's Section 349 claim.

### F. Choicepoint's Affirmative Defenses [43]

#### 1. Unclean Hands

 Plaintiff moves to strike Choicepoint's third affirmative defense of "unclean hands." This defense states that "Plaintiff's Complaint is barred, in whole or in part, by the doctrine of unclean hands." (Choicepoint Answer, Ex. C to Antollino Choicepoint Decl., at 10.) "The 'unclean hands' doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."" *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 329, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) (citing *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). It is undisputed that an unclean hands defense requires a finding of bad faith. *See Jones Apparel Group, Inc. v. Piconne*, No. 94 Civ. 0754, 1994 WL 260767, at *4 (S.D.N.Y. June 8, 1994). Moreover, under New York law, to assert a defense of unclean hands, a party must have been injured by the allegedly inequitable conduct. *See Netherby Ltd. v. G.V. Licensing, Inc.*, No. 92 Civ.

4239, 1993 WL 463679, at *6 (S.D.N.Y. Nov.9, 1993) (citing *Cohn & Berk v. Rothman–Goodman Management Corp.*, 125 A.D.2d 435, 509 N.Y.S.2d 367, 368 (2d Dep't 1986)).

 Pleading the words "unclean hands" without more, as Choicepoint has done, is not a sufficient statement of such defense. *See DS Am. (East) Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F.Supp. 786, 798 (E.D.N.Y.1995) (citing *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F.Supp. 832, 841 (S.D.N.Y.1988)). Its Answer offers plaintiff no indication as to how the doctrine of unclean hands would bar his claims. Accordingly, Choicepoint's defense of unclean hands is stricken without prejudice to its leave to amend by April 26, 2001.

#### 2. Third Party Liability

Choicepoint's sixth affirmative defense states that:

> "[P]laintiff's complaint is barred, in whole or in part, because some of the damages allegedly suffered by plaintiff did not result from any act or omission of [Choicepoint], but such damages resulted from the acts or omissions of persons other than [Choicepoint], for which acts or omissions [Choicepoint] is in no way liable."

(Choicepoint Answer at 10.) Plaintiff moves to strike this defense "insofar as it pertains to 'Inquest,' the third party contractor hired by Choicepoint." (Notice of Motion on Choicepoint Claims ¶ 4; Pl. Mem. Choicepoint at 21–23.) He points out, *inter alia*, that under the terms of the IBM–Choicepoint Agreement, Choicepoint assumed "all liability for subcontracts issued hereunder and the work or services

---

**43.** Because the Court dismisses each of plaintiff's claims against IBM, plaintiff's motion to strike IBM's affirmative defense of unclean hands is denied as moot.

performed thereunder ...," and that the subcontractors and their employees would be considered "employees" of Choicepoint, for whom Choicepoint "assume[d] full responsibility." (IBM–Choicepoint Agreement ¶ 10a.) Choicepoint does not dispute these contentions, but merely contends that the Court should not dismiss such defense as to certain other entities, e.g., the Santa Clara County Municipal Court. (Choicepoint Mem. at 21.) Accordingly, Choicepoint's affirmative defense is stricken, but only insofar as it pertains to the contractor in this case.

## III. Conclusion

For the foregoing reasons, the Court (i) grants IBM's motion for summary judgment as to plaintiff's Section 296(15) claim; (ii) grants IBM's motion and denies plaintiff's cross-motion for summary judgment as to plaintiff's Section 296(16) claim; (iii) grants IBM's motion and denies plaintiff's cross-motion for summary judgment as to each of plaintiff's FCRA claims against IBM; (iv) grants plaintiff's motion, and denies Choicepoint's motion for summary judgment on plaintiff's Section 1681b(b)(1)(A) claim; (v) denies plaintiff's motion and Choicepoint's cross-motion for summary judgment as to plaintiff's Section 1681k and 1681e(b) claims; (vi) grants Choicepoint's motion for summary judgment as to plaintiff's Section 349 claim; and (vii) denies plaintiff's motion to strike IBM's affirmative defense of unclean hands as moot; and (viii) grants plaintiff's motion to strike (a) Choicepoint's affirmative defense of unclean hands with leave to replead by April 26, 2001, and (b) Choicepoint's third party liability defense insofar as it pertains to its contractor in this case. SO ORDERED.